RICHARD LEWIS ATHEY, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 19831

August 21, 1990                    797 P.2d 956

*Laura Wightman FitzSimmons,* Carson City, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney, and *John Lukens,* Deputy District Attorney, Clark County, for Respondent.

**OPINION**

By the Court, YOUNG, C. J.:

Starting in September 1987, appellant Richard Athey lived with his girlfriend Donna Hutton and her 28-month-old son, Paul. On the evening of December 15, 1987, while Donna was away, Athey dialed "911" because Paul was comatose. When the paramedics arrived, Athey told them that Paul had fallen backwards off the bed, hit his head on the concrete floor, and lapsed

into unconsciousness. Paul was rushed to the hospital and examined by several doctors, each of whom concluded that Paul's injuries were not consistent with Athey's story and appeared instead to have been caused by child abuse.

Paul was pronounced dead about 30 hours later. Following an autopsy, a pathologist concluded that the cause of Paul's death was homicidal and that the injuries probably resulted from blunt trauma or shaking. Thereafter, Athey was charged with felony child abuse and murder. He was convicted of both crimes and sentenced to seventeen years in prison for felony child abuse and a consecutive term of life with the possibility of parole for murder.

On appeal, Athey first contends that during the closing rebuttal argument, the prosecutor impermissibly changed his theory from one of physical abuse to one of emotional abuse when he stated that the jury could convict Athey of child abuse "for the living hell he put Paul Hutton through for those few short months that he lived with him." Athey asserts that this change in theory violated his Sixth Amendment right to be informed of the charges against which he was expected to defend.

The State contends, however, that this statement by the prosecutor referred to the physical abuse alleged in the information. Indeed, our review of the prosecutor's other references in closing rebuttal made shortly before this statement clarifies that he was maintaining a theory of physical abuse. Furthermore, even assuming that the prosecutor's statement referred to emotional abuse, there was no lack of notice because the information twice specifically alleged "or mental suffering."

Based on the above-quoted statement, Athey also contends that the prosecutor changed his theory as to when the alleged child abuse occurred. Therefore, he contends, he was convicted without notice of the child abuse charges concerning the three month period prior to Paul's death, in violation of the Sixth Amendment. However, both the complaint and the information specified that the crimes occurred "between September 1, 1987 and December 15, 1987." Therefore, Athey had notice that he faced charges of felony child abuse prior to December 15, 1987.

Thus, we hold that the prosecutor did not change theories in the middle of his closing argument, depriving Athey of notice of the charges against which he should be prepared to defend. There is, however, a question of law regarding the sufficiency of the evidence in support of the jury's verdict of "guilty of child abuse and neglect with substantial bodily harm."

The jury's verdict is consistent with felony child abuse as set forth in NRS 200.508(2). While the information specified that the crimes were committed between September 1 and December 15, 1987, the jury was not asked, nor does its verdict reveal, whether the conviction was for acts committed on December 15, 1987, or for acts committed prior to that night. If the jury's verdict concerned felony child abuse for acts prior to December 15, 1987, we hold that there is insufficient evidence of "substantial bodily harm" for a felony conviction. *Contrast* Childers v. State, 100 Nev. 280, 284, 680 P.2d 598, 600 (1984). Thus, we hold that Athey's conviction of felony child abuse cannot be sustained for the period between September 1 and December 15, 1987.

Nevertheless, it is quite clear from our review of the prosecutor's closing argument that he was urging a conviction based on acts occurring on the evening of December 15, 1987. Athey contends that his convictions of both felony child abuse and first degree murder for the acts of December 15 violate the constitutional prohibition against double jeopardy. Athey correctly notes that in Talancon v. State, 102 Nev. 294, 721 P.2d 764 (1986), this court clarified the two-part test for purposes of double jeopardy analysis. In *Talancon,* we said that first it must be determined whether there are two offenses or only one. The test to be applied is "whether each provision requires proof of a fact which the other does not." *Id.* at 298, 721 P.2d at 766 (quoting Blockburger v. United States, 284 U.S. 299, 304 (1932)). Second, "where two statutory offenses constitute the 'same offense' under the *Blockburger* test, double jeopardy will not be violated by separate sentences for those two offenses following a single trial, if it appears that the legislature intended separate punishments." *Id.* at 301, 721 P.2d at 769.

Because the felony child abuse occurred on the same evening as the murder, Athey contends that the same act of child abuse constituted the basis for both offenses here. He persuasively distinguishes his case from the facts of Bludsworth v. State, 98 Nev. 289, 646 P.2d 558 (1982), in which substantial testimony established that the child had been seriously and persistently abused prior to the fatal injury and was a victim of the battered child syndrome. *Id.* at 290, 646 P.2d at 559. In *Bludsworth,* we upheld the conviction of separate offenses of child abuse and murder. *Id.* at 293, 646 P.2d at 560. Based on the evidence in his case, Athey asserts that, unlike *Bludsworth,* first degree murder could not have been committed in this case absent the commission of felony child abuse and that therefore the two convictions are based on the same offense. We agree.

Our next inquiry concerns whether the legislature nevertheless intended separate punishments. In Whalen v. United States, 445 U.S. 684 (1980), the United States Supreme Court stated that "where two statutory provisions proscribe the 'same offense,' they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent." *Id.* at 692. Although NRS 200.030 and NRS 200.508 both proscribe child abuse which results in death, we find nothing in these provisions that specifically authorizes cumulative punishment. *See* Missouri v. Hunter, 459 U.S. 359, 368 (1983).

Thus, because we have determined that the felony child abuse and the murder were the same offense and the legislature intended only one punishment for murder by child abuse, we hold that Athey's conviction of felony child abuse is barred by the prohibition against double jeopardy and must be reversed under the two-part test of *Talancon.*

Athey next contends that his conviction of first degree murder must be reduced to second degree because there was insufficient evidence of premeditation. The State correctly notes that "[t]he determination of the degree of crime is almost invariably left to the discretion of the jury." Hern v. State, 97 Nev. 529, 531, 635 P.2d 278, 279 (1981). In *Hern,* this court emphasized that in reviewing the sufficiency of the evidence underlying a jury's determination, "[t]he issue is not whether this court would have found beyond a reasonable doubt that appellant was guilty of first degree murder, but whether the jury, acting reasonably, could have been convinced to that certitude by the evidence it had a right to consider." *Id.*

Athey contends that the facts in his case are distinguishable from those in *Hern,* in which we determined that "[t]he nature and extent of the injuries, coupled with repeated blows, constitutes substantial evidence of willfulness, premeditation and deliberation." *Id.* at 533, 635 P.2d at 281. He argues that the bruises found on Paul during the autopsy were more likely the result of emergency medical treatment than of abuse. He further argues that because Paul's scalp bruises blended together upon external examination and were only revealed as three discreet injuries upon autopsy, the jury could not legitimately infer premeditation.

We believe that the jury's inference of premeditation was all the more legitimate precisely because it learned that what initially appeared to be one injury was actually several. Furthermore, we conclude that the present facts are virtually identical to those in *Hern.* The lay testimony about appellant's prior treatment of Paul and the expert medical testimony about the cause of death and

about Paul's injuries on December 15, 1987, provided ample circumstantial evidence of premeditation. Given the jury's discretion in determining the degree of murder, we hold that there was sufficient circumstantial evidence from which the jury could infer premeditation. *See Hern,* 97 Nev. at 533, 635 P.2d at 281. Therefore, Athey's conviction of first degree murder cannot be reduced to one of second degree.

Athey next contends that several instances of prosecutorial misconduct require reversal of both of his convictions. First, he asserts that the prosecutor abused his function by severing Donna Hutton, Paul's mother, from the complaint. He argues that the State severed Hutton but did not proceed against her, so that she was forced to assert her privilege against self-incrimination for fear that the felony charges would be pursued. Athey contends that the prosecutor's conduct constituted reversible error under our decision in Franklin v. State, 94 Nev. 220, 577 P.2d 860 (1978).

Even had Hutton's case not been severed, however, she still could have asserted her privilege against self-incrimination. Furthermore, unlike in *Franklin,* there is no evidence to show that the State persuaded Hutton that it would not prosecute if she did not testify for Athey.

Second, Athey asserts that a number of the prosecutor's statements to the jury during closing argument mandate reversal of both of his convictions. Athey acknowledges that defense counsel failed to preserve for our consideration these allegations of misconduct because counsel made only one objection during the prosecutor's closing argument. *See* Williams v. State, 103 Nev. 106, 110-111, 734 P.2d 700, 703 (1987). He contends, however, that "where the errors are patently prejudicial and inevitably inflame or excite the passions of the jurors against the accused, the general rule does not apply." Sipsas v. State, 102 Nev. 119, 125, 716 P.2d 231, 235 (1986) (citation omitted).

Our review of the record reveals that the errors, if any, were not so prejudicial and inflammatory as to justify a departure from the general rule stated in *Williams.* With respect to the conduct objected to at trial, the prosecutor's statements were nothing more than comments on the evidence and his view of what the evidence showed. *See* Santillanes v. State, 104 Nev. 699, 702, 765 P.2d 1147, 1149 (1988) and State v. Green, 81 Nev. 173, 176, 400 P.2d 766, 767 (1965).

Athey further contends that under *Sipsas,* the district court abused its discretion in admitting two autopsy photographs of

Paul's head because their prejudicial impact outweighed their probative value. *Sipsas* is distinguishable, however, because there the witness merely said the photograph "might" help him explain the cause of death. *Id.* at 122, 716 P.2d at 233. Furthermore, the trial judge in *Sipsas* initially denied admission of the photograph after finding that the prejudicial effect outweighed its probative value; later, the same photograph was erroneously admitted on another basis. We concluded that the district court abused its discretion in admitting the photograph which it had already found to be more prejudicial than probative. *Id.* at 124, 716 P.2d at 234.

By contrast, in the present case the witness stated affirmatively that the photographs would assist her in explaining the victim's injuries. In addition, the trial judge determined that the two autopsy photographs were more probative than prejudicial. In sum, we hold that the district court did not abuse its discretion in admitting the photographs. *See* Ybarra v. State, 100 Nev. 167, 172, 679 P.2d 797, 800 (1984).

Athey contends that even if this court disagrees that the separate assignments of error mandate reversal of his convictions, reversal is required under the doctrine of cumulative error. However, because we find no error other than in the conviction of felony child abuse, the doctrine does not apply here.

Having considered all of appellant's additional contentions and found them without merit, we hereby vacate the conviction of felony child abuse. In all other respects, the judgment of the district court is affirmed.

STEFFEN and ROSE, JJ., concur.

MOWBRAY, J., dissenting.

Respectfully, I dissent.

The tiny tot, Paul, the victim of these two crimes, who was eventually murdered by the appellant endured a horrible existence prior to his untimely but merciful demise. This dependent 28-month-old child, now deceased, who had nowhere to turn for help, was constantly and continuously abused and both physically and mentally tortured by the appellant, Richard Athey, during the victim's brief life existence.

A jury after a full trial found the appellant guilty of (1) felony child abuse and (2) murder of the child.

In its opinion today this Court has reversed and relieved the appellant of the first offense—the felony child abuse charge—on the principal ground that there was insufficient independent evidence to support the jury's verdict on that charge. I disagree. The record, in my opinion, speaks eloquently in support of the jury's

verdict of felony child abuse and cries out for support thereof. For instance, I find in the record the following:

First, the pediatrician, Dr. Golden, testified that she noticed faint bruises above Paul's left eye and on his left earlobe. She also discovered retinal hemorrhages in both of Paul's eyes. It was Dr. Golden's opinion at trial that the story related by appellant was not consistent with these physical findings and that Paul was the victim of battered child syndrome. Dr. Carlile, a pediatric intensivist, testified that during his examination of Paul he found some linear bruises over his buttocks. Dr. Carlile's most significant medical finding was that, within just a few hours of reportedly having been well, Paul's intercranial pressure was tremendously high. In Dr. Carlile's opinion, the swelling, bleeding and increased pressure of the brain were caused by traumatic force. Dr. Carlile also opined that, because the history did not explain his findings, Paul was a potential victim of child abuse. Dr. Hollander, a medical examiner for Clark County, performed an autopsy. Dr. Hollander testified that she found a number of contusions (bruises) on Paul's body including one on the left upper eyelid, some along the angle of the right jaw, a number on the left cheek, several small ones on the inside of the upper lip, one on the right upper arm and another on the left upper arm near the elbow, one on the posterior right side, several on the right leg, and a number of fairly large contusions on the lower back and on the buttocks. Her examination revealed bilateral subdural hematoma and that the brain was quite swollen and flattened. Dr. Hollander testified that in her opinion the injuries could not have been sustained by accident, and Paul's death was homicidal and his injuries were caused by either vigorous shaking or blunt trauma to the head.

Next, let us turn to the lay testimony. The prosecution presented testimony from a number of witnesses regarding appellant's treatment of Paul during the months prior to Paul's death. Natalie Sheppherd, appellant's next door neighbor, testified she noticed a change in Paul from the time before to the time after appellant moved in. Mrs. Sheppherd testified that every time appellant would drive up in his truck, Paul would start to cry and run toward home. On one occasion, Mrs. Sheppherd was talking with Paul on the steps outside their apartments when appellant arrived home. When Paul saw appellant, he started to cry and run, yelling his mother's name. Appellant sat down on a step, picked up Paul, pulled his diaper down and spanked him "as hard as he could," so hard that Sheppherd was "scared to death that he was going to break his back." After he spanked Paul, appellant jerked him by the arm and "literally threw him into the apartment."

Mrs. Sheppherd's two daughters testified that they noticed a change in Paul after appellant started to live with Paul and his mother. Colleen Sheppherd testified that Paul's mentality changed, that he wouldn't respond anymore and just repeated things. Darlene Sheppherd testified that Paul "would stand with his hands limp to his side" and "walked around like the [sic] was in a daze, like he was drugged."

Darlene Sheppherd further testified that on three separate occasions she saw appellant take Paul and put him on the edge of his pick-up truck bed, with Paul's feet hanging out of the truck. Appellant told Paul to "hold on," and Paul "would grab a hold of the lip of the truck . . . and Mr. Athey [appellant] would drive up and down the alleyway between the trash cans where his parking space was and where [her] car was and be laughing and saying 'Hold on Paul, hold on, ha, ha, ha' and Paul was petrified."

Next, Barbara Plascencia, a co-worker of Paul's mother, and Deborah Monterano, Plascencia's friend, visited Paul's mother in mid-September 1987. Plascencia and Monterano took Paul home with them that evening and later while changing Paul's diaper, Plascencia and Monterano noticed that he had a bruise from the base of his neck all the way to the bottom of his buttocks.

Linda Goss testified that she hosted a Thanksgiving dinner which was attended by appellant, Donna Hutton and Paul. During dinner, Paul stopped eating and appellant refused to excuse him. When Paul started to cry, appellant slammed his fist onto Paul's plate and shattered it. Appellant then yanked Paul out of his chair and took him to the bathroom. Ms. Goss went to the bathroom and found Paul sitting on the toilet, holding his arms out to her and shaking. Another dinner guest, Jo Schmidt, testified that she went into the bathroom and took Paul off the toilet and dressed him. Appellant told Schmidt that she didn't understand and that Paul was possessed by the devil.

The jury, under the Nevada Constitution, not this Court, is the exclusive finder of the facts under our system of jurisprudence. Its verdict should not be disturbed on appeal absent a showing of insufficient evidence to support that verdict.

Additionally, and ironically in the instant case the child abuser escapes liability for his heinous earlier child abuse conduct by eventually murdering the child victim of that prior conduct. I simply cannot accept such reasoning as being in accord with justice and the law. Therefore, I would uphold the jury's verdict in this case in its entirety and affirm the appellant's judgment of conviction on both counts, the felony child abuse charge and the murder charge. I would not thereby reduce his sentence in the State penitentiary.

SPRINGER, J., dissenting:

I agree that the jury's verdict should not be disturbed. The distinction between this case and Childers v. State, 100 Nev. 280, 680 P.2d 598 (1984), is insufficient to warrant reversal. To that end, I concur in the result urged by JUSTICE MOWBRAY.